```
1  DENNIS K. BURKE
   United States Attorney
2  District of Arizona

3  KEVIN M. RAPP
   Assistant U.S. Attorney
   Arizona State Bar No. 014249
4  Kevin.Rapp@usdoj.gov
   Two Renaissance Square
   40 North Central Avenue, Suite
5  Phoenix, Arizona 85004
   Telephone (602) 514-7500
```

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| United States of America, | CR-09-00386-PHX-ROS |
|---|---|
| Plaintiff, | **GOVERNMENT'S MOTION FOR DOWNWARD DEPARTURE PURSUANT TO U.S.S.G. § 5K1.1, CONSIDERATION OF FACTORS PURSUANT TO §3553 AND SENTENCING RECOMMENDATION** |
| v. | |
| Dustin Michael Thompson, | |
| Defendant. | |

The United States of America hereby moves for a downward departure pursuant to U.S.S.G. § 5K1.1 and Title 18 U.S.C. § 3553 for the reasons set forth in the attached memorandum and recommends that the court impose a sentence of thirty months. Thompson's sentencing is scheduled for May 2, 2011.

Respectfully submitted this 22nd day of April, 2011.

DENNIS K. BURKE
United States Attorney
District of Arizona

s/Kevin M. Rapp

KEVIN M. RAPP
Assistant U.S. Attorney

**MEMORANDUM**

The United States of America ("the government"), by and through its undersigned attorney, respectfully moves pursuant to 18 U.S.C. § 3553(e), 28 U.S.C. § 994(n), and U.S.S.G. § 5K1.1 to authorize this Court to depart downward from the minimum sentence dictated by the advisory Sentencing Guidelines and statute for the offense to which the above defendant has entered a guilty plea. In support of its motion, the government states as follows:

**I.      Government's Motion to Authorize a Downward Departure**

Section 5K1.1 of the Sentencing Guidelines allows the court to depart downward in the defendant's sentence for the defendant's assistance to the government. The appropriate reduction shall be decided by the court after consideration of certain factors. Those factors include, but are not limited to the following:

   (1) the court's evaluation of the significance and usefulness of the defendant's assistance, taking into consideration the government's evaluation of the assistance rendered:

   (2) the truthfulness, completeness, and reliability of any information or testimony provided by the defendant;

   (3) the nature and extent of the defendant's assistance;

   (4) any injury suffered, or any danger or risk of injury to the defendant or his family resulting from his assistance;

   (5) the timeliness of the assistance.

The United States moves this Court for a downward departure pursuant to U.S.S.G. § 5K1.1 based upon defendant Thompson's assistance to the government in its investigation of a mortgage fraud scheme.

///
///
///

**A.  Analysis of Factors Pursuant to U.S.S.G. §5K1.1.**

**1.  Significance and Usefulness of Defendant's Assistance**

Defendant Thompson's cooperation was sufficient enough to warrant the filing of this motion. Defendant was arrested in April 2009 and met with agents--nine months later--in December 2009. He provided information about his dealings with loan officer Vincent Vendittelli, among others.[1]

The investigation determined that Thompson was mentored by mortgage fraud coconspirator Mario Bernadel.[2] Bernadel taught Thompson the following:

(1)  how to purchase distressed homes by recruiting unqualified straw buyers;

(2)  how to direct the buyers to a loan officer who was more than willing to prepare loan applications containing false information; and

(3)  how to work with an escrow agent who would insure that Thompson received cash back at closing that was disguised as a decorating fee on the HUD-1.[3]

Eventually Thompson started his own company called Big Houses Fast Cars (BHFC) to facilitate these fraudulent transactions.

In total, Thompson facilitated the purchase of twenty-four properties resulting in $1,245,869.11 in cash back to Thompson. (*See* Exhibit A.) The consequences of Thompson's actions caused a loss of $4,156,057.93 to lending institutions.[4] *Id*. In the final analysis, the

---

[1] Vendittelli was indicted in CR-10-717-PHX-SRB, has pleaded guilty and is cooperating related to the conspiracy that he was involved in.

[2] Bernadel was convicted after trial and was sentenced to nearly 17 years for his involvement in a mortgage fraud scheme.

[3] A HUD-1 lists fees and payments to be made in connection with the proposed loan and are reviewed by the lender. If the lender approves the Pre-audit HUD-1, funds are wired to the title or escrow company to disburse accordingly. The lender instructions specify that the escrow agent must notify the lender of any material changes to the HUD-1 and receive the lender's approval prior to fund disbursement.

[4] The court's U.S.S.G. §2B1.1 loss calculation could also factor in the losses to the neighborhoods from the foreclosures caused by defendant's criminal conduct. The court can and should consider the collateral consequences of the foreclosures caused by defendant's
(continued...)

primary benefit to the United States of Thompson's cooperation was his information regarding Vendittelli.

**2.   Truthfulness, Completeness and Reliability of Information and Testimony**

Based on the government's investigation to date, defendant Thompson's information has been truthful with respect to his involvement with Vendittelli. In the United States' view, however, Thompson is minimizing his knowledge of the unqualified buyers. During debriefs and plea negotiations, Thompson downplayed his knowledge of the loan origination process facilitated by Vendittelli. In particular, he failed to acknowledge that is parents, aunt, ex-wife and friends were unqualified to purchase multiple homes.[5] Accordingly, the government submits that the defendant's information to be truthful with respect to his role in the offense but less than truthful regarding his knowledge of the false loan applications involving his family.

**3.   Nature and Extent of Defendant's Assistance**

The nature and extent of Thompson's assistance was helpful to understanding how he was introduced to loan officer Vendittelli. He also agreed to testify against Vendittelli. His efforts in this regard warrant a downward departure.

**4.   Danger of Risk of Injury**

The government is not aware of any threats that Thompson faced due to his cooperation. A cooperator, however, is always exposed to some degree of threats and intimidation especially while in custody. Accordingly, the government finds the risk of injury to Thompson, due to his cooperation, as moderate.

---

[4] (...continued)
fraudulent scheme. Defendant knew that the vast majority of the houses involved in the scheme would go into foreclosure and would substantially impact the value of nearby homes in the neighborhoods. Therefore, $4,156,057.93 is a conservative estimate of the losses attributable to Thompson's criminal activity.

[5] His reluctance to admit his knowledge of the false loan applications is underscored during his interview with the presentence writer when he initially agreed with the factual basis of his plea and then states "that's not what happened."(*See* PSR ¶ 14.)

### 5. Timeliness of Assistance

Defendant's assistance was less than timely. He delayed his cooperation for a period of nine months and only after he entered a guilty plea. As he was mentored by Bernadel to commit mortgage fraud he was positioned to testify at Bernadel's trial. Bernadel proceeded to trial on August 24, 2009, over four months *after* Thompson was arrested. In contrast, co-defendant Sean McLaughlin, cooperated immediately upon arrest, testified at Bernadel's trial and has continued to cooperate. Accordingly, Thompson's delay in cooperating diminished the usefulness of his information.

## II. Analysis of factors pursuant to Title 18, U.S.C. § 3553

### A. Nature and Circumstances of the Offense

Defendant pleaded guilty to participating in a mortgage fraud scheme resulting in approximately 24 foreclosed homes and $4,000,000 in losses to lenders. *Id*. He recruited straw buyers that were primarily family members and friends. He directed them to loan officer Vincent Vendittelli and others who prepared loan applications containing false information. Defendant was paid approximately $1,200,000 in cash back that he used to pay the mortgages on the properties, invested in other "get rich" schemes and on his own personal expenses.

### B. History and Characteristics of the Defendant

Defendant has a remarkably stable upbringing, education and employment record compared to most defendants involved in a fraud scheme of this magnitude. He obtained a college degree on a football scholarship and maintained white collar employment upon graduation. His family is surprisingly supportive given the fact that he involved them in the mortgage fraud scheme. Moreover, he has taken on the additional responsibility of being the primary care giver to his step children as his wife is herself in prison. (*See* PSR ¶ 39.) It is clear, however, that he struggles with alcohol dependence having obtained three convictions for DUI offenses. (*See* PSR ¶s 28-30.) This will need to be addressed while in prison and on supervised release. On balance, his history and characteristics weigh in his favor.

C. <u>Need for Sentence to Address Additional Title 18, U.S.C. § 3553 Factors.</u>

The recommended sentence of thirty months is reasonable upon consideration of the nature and circumstances of the offense and defendant's history and characteristics as discussed above, plus the additional 18 U.S.C. § 3553 factors, as set forth below:

> (1) to reflect the seriousness of the offense, to promote respect for the law and to provide just punishment;
>
> (2) to afford adequate deterrence to criminal conduct;
>
> (3) to protect the public from further crimes of the defendant; and
>
> (4) to provide the defendant with educational or vocational training, medical care or other correctional treatment.

It will take a sentence advised by the U.S.S.G. to address the seriousness of this defendant's criminal conduct and to have a deterrent value to defendant. A prison sentence is further warranted to protect the public. Lastly, Defendant can certainly benefit from educational or vocational training in a legitimate trade or profession, while in custody.

**III. <u>Sentence Parity</u>**

Defense counsel has urged that Thompson be compared to similar mortgage fraud defendants and receive a time-served sentence. (*See* Sentencing Memorandum, doc. # 164, p. 7-10 and Supplemental Sentencing Memorandum, doc. # 165.) Defendant has attached as an exhibit a spreadsheet prepared by the undersigned attorney that details the sentences imposed for similar mortgage fraud schemes prosecuted since 2008.[6] (*See* Attached Exhibt B.) Also, attached as Exhibit C is a summary of mortgage fraud cases that have been imposed nationwide for the Court's consideration. For reasons set forth below, the defendant is not sufficiently similar to the defendants who received time served sentences such that he also should receive such a sentence.

First, nothing in the plain language of 18 U.S.C. § 3553(a)(6) requires the Court to compare the sentences imposed on a range of defendants with defendant Thompson in the instant

---

[6] This spreadsheet details relevant information about mortgage fraud defendants prosecuted in the District of Arizona since 2008. It is frequently provided to defense attorneys during plea negotiations.

6

case. That subsection requires a sentencing Court to consider "the need to avoid *unwarranted* sentencing disparities among defendants with similar records who have been found guilty of similar conduct." *Id.* (emphasis added). The statute fails to instruct a sentencing Court on the manner of inquiring into putative sentencing disparities, and the Ninth Circuit has not addressed this manner of inquiry in the advisory Guidelines era; other Circuits have, however, and those Circuits have overturned sentences rigidly compared against average sentencing statistics. E.g., *United States v. Willingham*, 497 F.3d 541 (5th Cir. 2007). In *Willingham*, a case involving the possession of child pornography, the Court remanded for resentencing where a district court compared defendant's sentence to the average sentences compiled by the U.S. Sentencing Commission and reduced the sentence accordingly. *Id.* at 545. Averages "disregard individual circumstances and only reflect a broad grouping of sentences imposed on a broad grouping of criminal defendants; consequently, they are basically meaningless in considering whether a disparity with respect to a particular defendant is warranted or unwarranted." *Id.* at 544-45.

In the instant case, the Court has more than mere averages; the Court has a detailed chart, that sets out a series of objective factors, including the number of properties involved in the scheme, the loss attributable to the defendant, criminal history score, whether defendant cooperated and the sentence imposed. A chart cannot, however, describe the intangible statutory factors that a sentencing Court considers under 18 U.S.C. § 3553, including the history and characteristics of defendant, the need to deter further criminal conduct on the part of the individual defendant and the need to provide the defendant with correctional treatment "in the most effective manner". 18 U.S.C. § 3553(a)(1), (2)(B) and (2)(D). Moreover, to the extent these intangibles could be compiled, in the form of sentencing transcripts of each putative comparator case, such a compilation might run afoul of Fed. R. Crim. P. 2, with its aspiration to "secure simplicity in procedure and fairness in administration, and to eliminate unjustifiable expense and delay." Furthermore, "[a] reviewing court's concern about unwarranted disparities is at a minimum when a sentence is within the Guideline range." *Willingham*, 497 F.3d at 545.

Even if the Court were to consider comparator cases, Section 3553(a)(6) by its express

terms permits certain disparities, i.e., those that are warranted by particular facts or by disposition parameters particular to district courts in different regions. *See, e.g. United States v. Marcial-Santiago*, 447 F.3d 715, 718-19 (9th Cir. 2006) (holding that disparities created among defendants in different districts in illegal reentry cases by "fast-track" disposition programs are not "unwarranted"). The Court in *Marcial-Santiago* also confirmed that even an unwarranted disparity would not automatically render a sentence unreasonable. "[T]he need to avoid unwarranted sentencing disparities is only one factor a district court is to consider in imposing a sentence." *Id*. at 719.

Here, Thompson identifies defendant Christopher Bartlemus as a cooperating defendant who received a sentence of thirty days followed by 5 years supervised release as a defendant similar to Thompson. (*See* Exhibit B, Christopher Bartlemus, CR 08-00256-PHX-SMM.) For the following reasons Bartlemus is *not* similar to Thompson. First, Bartlemus was not the leader of the conspiracy in the same way Thompson was in this case. Bartlemus enabled the fraud as the escrow officer and received only a commsion on each property that he closed. In contrast, Thompson received $1,200,000 from the scheme. He was much more active in recruiting family members and friends as straw buyers. Lastly, Bartlemus cooperated shortly after arrest and testified in the trial of Mario Bernadel. He continued to cooperate in several other cases and did not minimize his guilt. Again, Thompson delayed his cooperation for nine months, failed to testify against Bernadel when he could have and did not testify in any other cases. Accordingly, he is not similar to Bartlemus.

Defendant then files a supplemental sentencing memorandum and compares Thompson to defendants Whitman and Leastman as similarly situated cooperating defendants that received time served sentences. (*See* Doc. # 165 and Exhibit B, Erin Leastman and Jake Whitman, CR08-00255-PHX-GMS.) Again, neither of these defendants are similar to Thompson. Leastman was the escrow officer who closed the transactions and did not profit to the extent Thompson did. Leastman cooperated shortly after arrest. Whitman was a leader, cooperated shortly after arrest and made $350,00 from the fraudulent transactions compared to Thompson's $1,200,000.

Whitman was involved in only ten properties as compared to Thompson's twenty-four. Lastly, Whitman was in a criminal history category I compared to Thompson's criminal history III. The mortgage fraud Defendants that the defense identifies as similar are not.

A defendant that is more similar to Thompson is Defendant Roy Fife. (*See* Exhibit B, Roy Fife, CR 08-00744-TUC-CKJ.) Fife's conspiracy involved 17 properties, resulted in $3,600,000 losses, he cooperated--albeit late--was in a criminal history category II and received a sentence of 30 months. If the defense insists on finding a mortgage fraud sentence for a defendant similar to Thompson, Fife satisfies that goal.

### IV. Government's Sentencing Recommendation

Before the court is a 32-year old male who has resided in Arizona since 2004. The defendant managed to obtain a college degree while on an athletic scholarship and maintained stable employment as an adult. In 2005, he was introduced to Mario Bernadel and embarked on a mortgage fraud spree that netted him $1,200,000 and eventually caused approximately $4,000,000 in losses to lenders. He eventually cooperated but his cooperation was diminished by his delay and his inability to acknowledge that the recruited buyers were falsifying loan applications. He received a generous plea as he was allowed to plead to a conspiracy pursuant to Title 18 U.S.C. § 371 rather than the charged conspiracy pursuant to Title 18 U.S.C. 1349.[7] The government recommends the following guideline calculation:

///

///

///

---

[7] In Sarbanes-Oxley, Congress enacted 18 U.S.C. § 1349, a new criminal law targeted specifically at conspiracies and attempts to commit mail and wire fraud offenses. Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, 116 Stat. 8054 (2002). One of the major impacts of 18 U.S.C. § 1349 on conspiracy prosecution is the penalty it provides for conspiracy to commit mail or wire fraud. When prosecuted under 18 U.S.C. § 1349, and not 18 U.S.C. §371, conspiracy to commit mail or wire fraud carries the same potential penalty as the underlying mail or wire fraud offense, now twenty years. If brought under 18 U.S.C. §371, and not 18 U.S.C. § 1349, the same conspiracy penalty is capped at a five year maximum. Arguably, by electing to use 18 U.S.C. § 1349, prosecutors have more power to affect the severity with which an individual may be dealt.

| | | | |
|---|---|---|---|
| Base Offense Level: | | 6 | U.S.S.G. § 2B1.1(a)(1) |
| Specific offense Characteristic: | | +18 | U.S.S.G. §2B1.1(b)(1)(H) |
| Acceptance of Responsibility: | | -3 | U.S.S.G. § 3E1.1(a) |
| Specific offense Characteristic: | | +2 | U.S.S.G 2B1.1(b)(14)(A)($1,000,000 in gross receipts from financial institutions) |
| Substantial Assistance: | | -8 | U.S.S.G. § 5K1.1 |
| Total Offense Level: | | 15 | |

The applicable guideline range, based on the above calculation, in a criminal history category III, is 24-30 months. The undersigned attorney recommends a sentence of thirty months. For these reasons, the government submits this motion to authorize the Court to depart below the applicable advisory guideline range of 70-87 months, and provides the Court with a sentencing recommendation.

Respectfully submitted this 22nd day of April, 2011.

DENNIS K. BURKE
United States Attorney
District of Arizona

s/Kevin M. Rapp

KEVIN M. RAPP
Assistant U.S. Attorney

**CERTIFICATE OF SERVICE**

I hereby certify that on April 22, 2011, I electronically transmitted the attached document to the clerk's office using the CM/ECF System for filing documents and sent the attached document to the following CM/ECF registrant: Patrick E. McGillicuddy

s/Carolyn Rerucha